IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| JO ANN SIMPSON, individually and as personal representative of the estate of JOSHUA SIMPSON, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:16cv162 (JCC/TCB) |
| COMMONWEALTH OF VIRGINIA, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## M E M O R A N D U M   O P I N I O N

This matter is before the Court on Defendants' Motion to Dismiss.  [Dkt. 3.]  For the following reasons, the Court will grant Defendants' motion to dismiss and dismiss Plaintiff's Complaint [Dkt. 1-1].

### I. Background

At the motion to dismiss stage, the Court must read the complaint as a whole, construe the complaint in the light most favorable to the plaintiff, and accept the facts alleged in the complaint as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The facts below are taken from Plaintiff's Complaint and facts available as a matter of public record.  *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

Plaintiff Jo Ann Simpson ("Plaintiff" or "Mrs.

Simpson") brings this suit as the personal representative and administrator of the estate of the deceased Joshua Michael Simpson ("Decedent").  Decedent was a mentally ill individual living in Warrenton, Virginia in 2014.  (Compl., ¶¶ 4,6.) Plaintiff brings claims against Defendant the Commonwealth of Virginia ("the Commonwealth"), Defendant Steven Flaherty in his official capacity as the Superintendent of the Virginia Department of State Police ("Superintendent Flaherty"), and Defendants John Does ("Doe Defendants") who are currently unidentified police officers employed by the Virginia Department of State Police ("VSP").  (*Id.* at ¶¶ 7-9.)  Collectively, the Court will refer to the Commonwealth, Superintendent Flaherty, and the Doe Defendants as "Defendants".

Decedent lived in Warrenton, Virginia, and suffered from mental illness leading him to sometimes suffer paranoia and delusion.  (*Id.* at ¶ 10.)  Decedent suffered from a recurring delusion that he was the "King of Israel."  (*Id.*)  In or around 2013, Decedent was acquitted of a crime by reason of insanity. (*Id.* at ¶ 11.)  At that time, the Warrenton Town Police seized Decedent's firearms after Decedent was involuntarily committed to a mental facility pursuant to a temporary detention order. (*Id.*)

In or around 2014, Decedent's landlord retained a lawyer to initiate eviction proceedings against Decedent.  (*Id.*

2

at ¶ 12.)   In response, Decedent delivered a strange letter to the landlord's attorney. (*Id.*)   The letter ordered the landlord to turn the property over to Decedent as "the King of Israel." (*Id.*)   The letter also purported to find the landlord guilty of various crimes. (*Id.*)   The attorney contacted the Fauquier County Police Department ("FCPD") as a result of this letter. (*Id.*)

On October 4, 2014, the owner of "The Bridge," a restaurant in Warrenton, contacted FCPD after receiving a similar strange letter from Decedent. (*Id.* at ¶ 13.)   In that letter, Decedent again claimed to be the "King of Israel" and claimed that the owner of The Bridge had been accused of various crimes and convicted *in absentia*. (*Id.*)   This letter demanded ownership of The Bridge and $20,000. (*Id.*)

On the morning of October 6, 2014, FCPD opened a criminal investigation into Decedent's letter to the owner of The Bridge. (*Id.* at ¶ 14.)   FCPD were advised by an Assistant Commonwealth's Attorney at that time that Decedent had not yet made any direct threats, and thus no crime had yet been committed. (*Id.* at ¶ 14.)   Later that same morning, Detective Lillard of the FCPD ("Lillard") was instructed to obtain, and did obtain, a warrant for an Emergency Custody Order ("ECO") requiring Decedent to undergo a mental evaluation. (*Id.* at ¶ 15.)   At or around 1:30 p.m. of October 6, 2014, Detective Zeets

3

of the FCPD ("Zeets") and Lillard attempted to serve the ECO on Decedent as Decedent was walking towards his residence. (*Id.* at ¶ 16.)

Decedent refused to co-operate with Zeets and Lillard when he noticed their police vehicle, and fled into his residence. (*Id.*)  Zeets attempted negotiations with Decedent through an open second-story window. (*Id.* at ¶ 17.)  During these negotiations, Decedent threw a receipt documenting the purchase of a shotgun to Zeets. (*Id.*)  Zeets was unable to persuade Decedent to voluntarily comply with the ECO, but was successful in obtaining Decedent's cell phone number. (*Id.* at ¶ 18.)  Zeets continued intermittent communication with Decedent through his cell phone. (*Id.*)

At or around 5:30 p.m. of October 6, 2014, VSP, FCPD, and the Warrenton Police Department ("WPD") held a joint briefing on the situation involving Decedent. (*Id.* at ¶ 19.)  FCPD and WPD updated VSP and the Doe Defendants on the circumstances of the case, including Decedent's prior record and his history of mental illness. (*Id.*)  At some point during Decedent's negotiations with the police, Decedent communicated to the police that he had built a model of The Bridge restaurant and believed that God had instructed him to place the model on the sidewalk in front of his house. (*Id.* at ¶ 21.)  Decedent explained that he believed that if the model levitated back into

his house at 9:00 a.m. it was God's will that Decedent be granted the demands in his letter to The Bridge's owner. (*Id.*) Decedent claimed that he would give up voluntarily if, at 9:00 a.m. on October 7, 2014, the model of the restaurant did not levitate back into his apartment, per the instruction he believed he had received from the Almighty. (*Id.*)

At some point after 5:30 p.m. on October 6, 2014, VSP obtained a felony arrest warrant against Decedent for possession of a firearm by a person acquitted by reason of insanity. (*Id.* at ¶ 22.) At approximately 9:45 p.m. of October 6, 2014, Decedent walked onto his porch to give Zeets letters regarding God. (*Id.* at ¶ 23.) When Decedent walked onto his porch, unidentified police officers unsuccessfully attempted to incapacitate Decedent with a stun gun, causing Decedent to run back into the residence. (*Id.*) Once he was inside his house, Decedent informed police that no further progress would be made until morning. (*Id.*)

At or around 12:00 a.m. on October 7, 2014, one or more heavily armed VSP Tactical Operations Teams comprised of Doe Defendant officers arrived on the scene with two armored personnel vehicles. (*Id.* at ¶ 24.) The Doe Defendants then deployed flashbangs to distract Decedent while breaching Decedent's window with a "throw phone." (*Id.*) Decedent responded to the use of flashbangs and the "throw phone" by

5

firing shotgun shots from his window. (*Id.*) Beginning at or around 1:00 a.m. on October 7, 2014, the Doe Defendants deployed tear gas canisters into Decedent's house through the windows. (*Id.* at ¶ 25.) The Doe Defendants repeated this act several times over that night. (*Id.*) Each time Defendants deployed tear gas into his house, Decedent responded by firing his shotgun out of his window. (*Id.*) As many as 60 gas canisters were fired into Decedent's house overnight. (*Id.* at ¶ 26.)

At approximately 6:45 a.m. the Doe Defendants deployed their final gas canister. (*Id.* at ¶ 27.) In response to the deployment of this gas canister, Decedent emerged from the front door of his house firing his shotgun. (*Id.*) As Decedent was exiting his house and firing his shotgun, several Doe Defendant police snipers took successive shots at Decedent, hitting him and leaving him lying on his back in the doorway. (*Id.* at ¶ 28.) As Decedent lay in the doorway, his shotgun was positioned between his legs with the barrel resting on the floor and the butt near his chest. (*Id.*) Another Doe Defendant sniper then fired a shot at Decedent's shotgun, rendering it inoperable. (*Id.* at ¶ 29.) Unsure as to whether Decedent was fully incapacitated or still posed an active threat, another Doe Defendant fired a beanbag round, striking Decedent in the chest. (*Id.* at ¶ 30.) After the beanbag struck Decedent, he threw it back towards police and requested that they "shoot [him] in the

head." (*Id.*)

At this point, FCPD brought in a K9 unit to attempt physical apprehension of Decedent. (*Id.* at ¶ 31.) At this point, multiple, conflicting orders were given regarding the K9 unit, with "multiple [unidentified] persons simultaneously issuing orders to both release, and not to release, the dog." (*Id.*) Ultimately, FCPD deployed the K9 dog and received "negative results," as Decedent did not react to bites from the dog. (*Id.* at ¶ 32.) Decedent was then taken into custody and was transported to INOVA Fairfax Hospital, where he died from his gunshot wounds on October 10, 2014. (*Id.* at ¶ 33.)

On December 3, 2014, Plaintiff was certified as the personal representative of Decedent's estate by the Clerk of the Circuit Court of Fauquier County. (Pl.'s Mem. in Opp'n, Ex. B. [Dkt. 18-1].) Plaintiff filed multiple FOIA requests regarding the events surrounding Decedent's death, and has received responses from the Town of Warrenton, Fauquier County, and the Fauquier County Commonwealth's Attorney. (Compl., ¶ 34.) Plaintiff had not, at the time of this motion, received a FOIA response from the VSP. (*Id.*) Plaintiff filed this suit in the Circuit Court for Fauquier County on December 21, 2015. It was removed to this Court by Defendants on February 18, 2016. (Notice of Removal [Dkt. 1].) Defendants filed this Motion to Dismiss on February 25, 2016. The matter was fully briefed, and

7

argued on April 28, 2016. The Court requested supplemental briefing on the issue of Eleventh Amendment immunity at that time. That briefing was received on May 5, 2016, and May 9, 2016. The motion is now fully briefed and ripe for decision.

## II. Legal Standard

Defendants move to dismiss under Rule 12(b)(1) for lack of jurisdiction and under Rule 12(b)(6) for failure to state a claim. "[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982). A motion pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges the Court's subject matter jurisdiction over the pending action. Fed. R. Civ. P. 12(b)(1). Defendants may attack subject matter jurisdiction in one of two ways. As relevant here, the assertion of immunity is properly addressed by the Court on a motion filed pursuant to Rule 12(b)(1). *Smith v. Wash. Metro. Area Transit Auth.*, 290 F.3d 201, 205 (4th Cir. 2001) (citing *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995)). In this instance, all facts alleged in the complaint are presumed to be true. *Virginia v. United States*, 926 F. Supp. 537, 540 (E.D. Va. 1995). "Federal courts are

8

courts of limited jurisdiction, and we presume that a cause lies outside this limited jurisdiction.  The burden of establishing the contrary rests upon the party asserting jurisdiction." *Wheeling Hosp., Inc. v. Health Plan of the Upper Ohio Valley, Inc.*, 683 F.3d 577, 583-84 (4th Cir. 2012) (citation omitted).

Defendants also challenge the sufficiency of the complaint under Rule 12(b)(6).  "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, [a Rule 12(b)(6) motion] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999)(internal citation and quotation marks omitted). While the court must accept well-pleaded allegations as true when ruling on a Rule 12(b)(6) motion, the court need not accept as true legal conclusions disguised as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 679-81 (2009).  Therefore, a pleading that offers only a "formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  Nor will a complaint that tenders mere "naked assertion[s]" devoid of "further factual enhancement." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557.

In the instance where sufficient facts are alleged in the complaint to rule on an affirmative defense, such as the

statute of limitations, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6).  This principle only applies, however, if all facts necessary to the affirmative defense "clearly appear[ ] *on the face of the complaint*." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (emphasis in original); *see also* 5B Wright & Miller, Federal Practice & Procedure § 1357(3d ed. 2004).

### III. Analysis

Plaintiff styles her Complaint as including Six Counts: (I) Wrongful Death; (II) Negligence; (III) Gross Negligence; (IV) Liability of the Commonwealth; (V) Violation of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"); and (VI) Violation of the Decedent's Fourth and Fourteenth Amendment Rights under 42 U.S.C. § 1983 (the "Constitutional Claims").[1]   Because Count I, Wrongful Death, merely establishes Plaintiff's standing to bring the suit for injuries suffered by Decedent and Count IV, Liability of the Commonwealth, merely lays out Plaintiff's argument for holding the Commonwealth liable on the other counts, there are in fact

---

[1] Plaintiff's Complaint actually refers to the Constitutional Claims as a second Count IV.  (Compl. at 13.)  For ease of reference, the Court will identify them as Count VI.

only four active claims contained in Plaintiff's complaint.[2]  The
Court will begin its analysis with a discussion on the basis of
the Court's jurisdiction over Plaintiff's claims, and will then
address the Defendants named by Plaintiff and the defenses
raised by each of them in turn, beginning with the Commonwealth,
proceeding through Superintendent Flaherty, and ending with the
Doe Defendants.

### A.  Jurisdiction

Plaintiff originally filed this case in the Circuit
Court for Fauquier County.  It was removed to this Court by
Defendants on February 18, 2016.  (Notice of Removal [Dkt. 1].)

---

[2]   Actions for Wrongful Death are authorized in the
Commonwealth by Va. Code Ann. § 8.01-50.  It provides that

> Whenever the death of a person shall be
> caused by the wrongful act, neglect, or
> default of any person or corporation, or of
> any ship or vessel, and the act, neglect, or
> default is such as would, if death had not
> ensued, have entitled the party injured to
> maintain an action . . . then, and in ever
> such case, the person who, or corporation or
> ship or vessel which, would have been liable
> if death had not ensued, shall be liable to
> an action for damages.

Va. Code Ann. § 8.01-50.  "Virginia's wrongful death statute
does not create a new cause of action, but only a right of
action in a personal representative to enforce the decedent's
claim for any personal injury that caused death." *Miller v.
United States*, 932 F.2d 301, 303 (4th Cir. 1991)(citing Va. Code
§ 8.01-50.)  Accordingly, Counts I, II, and III are better
understood by collapsing them into two Counts: Count II, for
Wrongful Death by Negligence; and Count III, for Wrongful Death
by Gross Negligence.  The Court interprets Counts II and III of
Plaintiff's Complaint as such.

As the basis for their removal, Defendants invoked, *inter alia*, 28 U.S.C. §§ 1331, 1441, 1367(a).  Section 1441 provides that except as otherwise provided, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district of the United States for the district and division embracing the place where such action is pending."  Section 1331 provides that "the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Finally, § 1367(a) provides that, generally, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction of all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367(a).

This Court has original jurisdiction over Plaintiff's claims brought under 42 U.S.C. § 1983 and the ADA pursuant to 28 U.S.C. 1331.  It therefore has supplemental jurisdiction over Plaintiff's state law wrongful death claims pursuant to 28 U.S.C. 1367(a).  Because this Court has original or supplemental jurisdiction over all of Plaintiff's claims, Defendants' removal was proper, and the case is properly before this Court.

This Court's jurisdiction over Plaintiff's state law claims is dependent upon the existence of Plaintiff's claims arising in federal law. *See* 28 U.S.C. § 1367(a). Generally, dismissal of Plaintiff's federal law claims would result in a remand of Plaintiff's state law claims to state court for resolution. *O'Bar v. Pinion*, 953 F.2d 74, 85 (4th Cir. 1991). However, "[i]n a § 1983 action in federal court, where all federal claims are disposed of in favor of the defendants, leaving only state claims that have been briefed by both parties and are 'patently without merit,' the balance between judicial efficiency and comity is struck in favor of the federal court's disposition of the state claims." *McLenagan v. Karnes*, 27 F.3d 1002, 1009 (4th Cir. 1994)(quoting *O'Bar*, 953 F.2d at 85). As that situation presents itself in this case, the Court reaches both Plaintiff's claims arising under state law and her claims arising under federal law in its analysis below.

The Court will now address the merits of Defendants' Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6).

### B. Commonwealth of Virginia

1. Standing

The Commonwealth first claims that Plaintiff lacks standing to bring her wrongful death action as personal representative of decedent's estate. Defendant additionally claims that Plaintiff lacks standing to bring any of her claims

against the Commonwealth as Plaintiff's initial notice of this suit contained representations that Decedent had 2 surviving children who would be the statutory beneficiaries of this action. (Def.'s Mem. at 6-7.)  However, Plaintiff has since introduced a copy of the Fauquier County Circuit Court's certification that Plaintiff is the personal representative and administrator of the personal estate of Decedent. (Pl.'s Mem. in Opp'n, Ex. B.)  Plaintiff has also clarified that Decedent did not, in fact, have any children, and her prior representation to that effect was an error. (Pl.'s Mem. at 8-9.)  Plaintiff has clarified that she does have standing to bring these actions.

### 2.  Eleventh Amendment Immunity

The Commonwealth asserts Eleventh Amendment immunity as a jurisdictional defense to Plaintiff's claims.  The "ultimate guarantee of the Eleventh Amendment is that non-consenting states may not be sued by private individuals in federal court." *Bd. of Trustees of Univ. Ala. v. Garrett*, 31 U.S. 356, 363 (2001); *See also Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Hans v. Louisiana*, 134 U.S. 1, 18-21 (1890).  The Eleventh Amendment is a privilege of the States, and as such, "[a] State remains free to waive its Eleventh Amendment immunity from suit in a federal Court." *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002).  When a State

14

voluntarily invokes the jurisdiction of the federal courts by removing a case from its own courts to federal court, it waives its Eleventh Amendment immunity from suit in federal court. *Id.* at 624.

The Eleventh Amendment immunity from suit in federal courts "does not define the scope of the States' sovereign immunity; it is but one particular exemplification of that immunity." *Fed. Mar. Com'n v. S.C. Ports Auth.*, 535 U.S. 743, 754 (2002). Even where a state cannot avail itself of the Eleventh Amendment immunity from suit in federal court, it may still be able to draw from the residual well of common law sovereign immunity retained by the States. *Id.; cf. Lapides,* 535 U.S. at 618 (immunity unavailable to the State where it has both waived its Eleventh Amendment immunity through removal *and* waived common law sovereign immunity against suit in its courts through statute).

By removing this case and voluntarily invoking the jurisdiction of this Court, Defendants have waived any Eleventh Amendment immunity they may have possessed. Removal to this Court does not affect any residual sovereign immunity retained by the Commonwealth. The Court will now proceed to the question of the Commonwealth's residual, common law sovereign immunity.

### 3. Common Law Sovereign Immunity

The Commonwealth has asserted sovereign immunity

15

defenses to each of Defendant's state law causes of action, Counts I through IV.  Plaintiff contends that the Commonwealth has waived sovereign immunity through the Virginia Tort Claims Act ("VTCA").  The VTCA waives sovereign immunity for damages arising from "personal injury or death caused by the negligent or wrongful act or omission of any employee while acting within the scope of his employment under circumstances where the Commonwealth or transportation district, if a private person, would be liable to the claimant," subject to several exceptions.  Va. Code § 8.01-195.3.  Those exceptions include "[a]ny claim based upon an act or omission of an officer, agent, or employee of any agency of government in the execution of a lawful order of any court."  *Id.*  The Commonwealth argues that as all of the actions giving rise to Plaintiff's cause of action in this case were taken while attempting to execute a court order, and as Plaintiff does not challenge the propriety of the ECO, the subsequent arrest warrant issued for Mr. Simpson, or the search warrant issued for his house, the Commonwealth retains sovereign immunity for actions taken by its employees in execution of those orders.  Plaintiff argues that the lawful order exception to the waiver of sovereign immunity in the VTCA does not apply to arrest warrants or search warrants.

The Supreme Court of Virginia has not explicitly addressed whether arrest warrants or search warrants are court

16

orders for purposes of the lawful court order exception to the VTCA's waiver of sovereign immunity.  This Court now finds that by the plain language of Va. Code § 8.01-195.3(4), the lawful order exception to the VCTA's waiver of sovereign immunity covers actions taken in the execution of a lawful arrest or search warrant.

The Supreme Court of Virginia has held that the VTCA, like any statutory waiver of sovereign immunity, stands in derogation of the common law, and thus "its limited waiver of immunity must be strictly construed." *Baumgardner v. Sw. Va. Mental Health Inst.*, 442 S.E.2d 400, 402 (Va. 1994).  They have also found the language of Virginia Code § 8.01-195.3(4) to be unambiguous and held that it ought to be applied according to its plain meaning.  *Id.*  The plain language of Virginia Code § 8.01-195.3(4) does not limit its applicability to only mental health orders or protective custody orders.  It clearly contemplates "a lawful order of any court."  Va. Code § 8.01-195.3(4).  Black's Law Dictionary defines an order as "a written direction or command delivered by a government official, especially a court or judge." *Order, Black's Law Dictionary* (10th ed. 2014).  Black's defines an arrest warrant as "[a] warrant issued by a disinterested magistrate after a showing of probable cause, directing a law-enforcement officer to arrest and take a person into custody." *Arrest Warrant, Black's Law*

17

*Dictionary* (10th ed. 2014).  The arrest warrant issued by the Commonwealth of Virginia in this case contains language directed "to any authorized officer," instructing them that they "are hereby *commanded* in the name of the Commonwealth of Virginia forthwith to arrest and bring the Accused before the Court." (Defendant's Memorandum in Support, Ex. 3 [Dkt. 4-3] (emphasis added).)  The arrest warrant was signed by a magistrate. Because arrest warrants in the Commonwealth are issued by a court and are written "direction[s] or command[s]" to arrest an individual and bring him before the court, this Court finds that arrest warrants fall within the plain meaning of Va. Code § 8.01-195.3(4) and its exception to the VTCA's waiver of sovereign immunity.

The VTCA's waiver of sovereign immunity is therefore inapplicable to this case.  Plaintiff has failed to identify any other valid waiver of sovereign immunity by the Commonwealth. Therefore, the Court finds that the Commonwealth retains sovereign immunity on Plaintiff's State Law Claims and dismisses Counts II and III with prejudice as to the Commonwealth.

### 4.  ADA Claims

Plaintiff alleges that Defendants discriminated against Decedent due to his mental disability by "approving an exceedingly aggressive, excessive, and unreasonable use of force against him" and "failing to train their officers in the

18

appropriate and reasonable police practices under the circumstances and/or failing to follow such training in this instance." (Compl., ¶ 65.) Defendants respond that any claim Plaintiff may have had under the ADA is now time-barred.

Congress did not include a federal statute of limitations establishing when plaintiffs may assert claims under the ADA. "In the event of such an omission, 42 U.S.C. § 1988(a) provides for the selection of an appropriate common-law statute of limitations, which is most applicable to the federal action." *Wolsky v. Med. Coll. of Hampton* Roads, 1 F.3d 222, 223 (4th Cir. 1993). The Supreme Court has interpreted this provision as requiring the application of the most analogous state-law cause of action from the state in which the claim is heard. *Id.* (citing *Wilson v. Garcia*, 471 U.S. 261 (1985)).

While the applicable limitation period is borrowed from state law, the accrual of a cause of action under the ADA is a question of federal law. *Guerrero v. Weeks*, No. 1:13cv837 (JCC/JFA), 2013 WL 5234248, at *5 (E.D. Va. Sept. 16, 2013)(citing *Synergistic Int'l, L.L.C. v. Korman*, No. 2:05cv49, 2007 WL 517677, at *9 (E.D. Va. Feb. 8, 2007)). Causes of action under federal law accrue when the plaintiff "possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995)(citing *United*

*States v. Kubrick*, 444 U.S. 111, 122-24 (1979)).  Once a cause

of action has accrued under federal law, federal courts are

"obligated not only to apply the analogous state statute of

limitations . . . but also to apply the State's rule for tolling

that statute of limitations."  *Scoggins v. Douglas*, 760 F.2d

535, 537 (4th Cir. 1985)).

ADA claims are subject to a one-year statute of

limitations period in Virginia.  *See Guerrero*, 2013 WL 5234248,

at *5 (citing *A Soc'y Without a Name v. Virginia*, 655 F.3d 342,

342 (4th Cir. 2011)).  Plaintiff's argument that she could not

have discovered the injury at issue in the case through diligent

effort until August 30, 2015, is not persuasive.  The shooting

and Decedent's subsequent death both occurred in October of

2014.  At the very least, Plaintiff must have been aware that

Decedent had been shot and killed by police when she was

appointed administrator of his estate on December 3, 2014.  (See

Pl.'s Mem. in Opp., Ex. B.)

Plaintiff argues that "[b]ecause the state and county

authorities possessed almost all of the relevant information

surrounding the death of her son, Ms. Simpson had no ability to

determine exactly how or why her son died until these

authorities produced their reports."  (Pl.'s Mem. in Opp'n at

23.)  Plaintiff's argument misunderstands the nature of inquiry

notice.  Plaintiff's ADA claim did not accrue when the police

released their reports on the shooting or when her inquiries were answered, but when Plaintiff was "put on notice – e.g., by the knowledge of the fact of injury and who caused it – to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim." *Nasim*, 64 F.3d at 955.   It is apparent from the face of Plaintiff's complaint that by December 3, 2014, at the latest, Plaintiff must have been aware of Decedent's death and the police agencies involved.   Plaintiff "should have known of [her] purported injury at this time." *A Soc'y Without a Name*, 655 F.3d at 348.   Any claim she had under the ADA therefore accrued on December 3, 2014.   This action was not filed until December 21, 2015, outside of the applicable one-year limitation period.   Because it is clear that Plaintiff's ADA claim is time-barred, the Court dismisses Count V of Plaintiff's Complaint with prejudice as to all Defendants.

### C.   Defendant Flaherty

Plaintiff asserts each count of her Complaint against Superintendent Flaherty in his official capacity as Superintendent of the Virginia Department of State Police. (Compl., ¶¶ 35-69.)   The Court will now address each of Plaintiff's claims as asserted against Superintendent Flaherty.

### 1.  Wrongful Death by Negligence

Count II of Plaintiff's Complaint asserts a claim for wrongful death against Superintendent Flaherty under an ordinary

21

negligence theory.  "The elements of an action in negligence are a legal duty on the part of the defendant, breach of that duty, and a showing that such breach was the proximate cause of injury, resulting in damage to the plaintiff."  *Blue Ridge Serv. Corp. of Va. v. Saxon Shoes, Inc.*, 271 Va. 206, 624 S.E.2d 55, 62 (2006)(citing *Trimyer v. Norfolk Tallow Co.*, 192 Va. 776, 66 S.E.2d 441, 443 (1951)).  Plaintiff specifically alleges that Flaherty, in his official capacity, owed a duty to Decedent to protect his life and wellbeing in the performance of his duties. Plaintiff alleges that Flaherty violated this duty by negligently failing to train his officers on how to deescalate situations involving mentally ill suspects.

Defendants argue that Flaherty is entitled to sovereign immunity against Plaintiff's claims for ordinary negligence.  In Virginia, "high level governmental officials have generally been accorded absolute immunity" for actions taken in their official capacity.  *Messina v. Burden*, 228 Va. 301, 321 S.E.2d 657, 661 (1984).  In *Messina*, the Supreme Court of Virginia established a four-part test for determining whether a state employee is protected from suit by sovereign immunity. The four *Messina* factors are: (1) the nature of the function performed; (2) the extent of the state's interest and involvement in the function; (3) the degree of control exercised by the state over the employee; and (4) whether the act

complained of involved the use of judgment and discretion.
*Messina*, 321 S.E.2d at 663.

The Supreme Court of Virginia explained in *Messina*
that this four-part test did not represent a break with
precedent, but was developed by "distilling general principles
from [its] prior decisions." *Id.* at 662.  The Supreme Court of
Virginia had frequent opportunity to engage in a case-by-case
assessment of the availability of sovereign immunity for
official capacity defendants in these prior decisions.  In those
cases, the Supreme Court of Virginia routinely held that
officers at a further remove from the Commonwealth than the
Superintendent of the Department of State Police were entitled
to immunity for claims arising out of acts that fell within the
scope of their official duties.  *See, e.g.*, *Sayre v. The Nw.
Turnpike Road*, 37 Va. (10 Leigh) 454 (1839)(holding the
president and directors of the Northwestern Turnpike Road immune
against a claim that a bridge built by their company was
negligently constructed); *Sayers v. Bullar*, 180 Va. 222, 22
S.E.2d 9, 12 (1942)(workers performing blasting operations for
the State were immune because in performing the blasting they
"were simply carrying out instructions given them" by a state
agency and "were acting solely in their representative capacity
as lawful and proper agents of the State and not in their own
individual right"); *Kellam v. School Board*, 202 Va. 252, 117

S.E.2d 96 (1960)(school board was sufficiently high level official to qualify for immunity); *Lawhorne v. Harlan*, 214 Va. 405, 200 S.E.2d 569 (1973)(hospital administrators at University of Virginia Hospital sufficiently high level to qualify for immunity); *Banks v. Sellers*, 224 Va. 168, 294 S.E.2d 862 (1982)(division school superintendent and high school principal immune in suit alleging failure to provide a safe environment); *Bowers v. Commonwealth*, 225 Va. 245, 302 S.E.2d 511 (1983)(highway department resident engineer immune from suit alleging negligent construction of a culvert by the highway department); *Hinchey v. Ogden*, 226 Va. 234, 307 S.E.2d 891 (1983)(Superintendent of the Norfolk-Virginia Beach Expressway immune from suit for negligently failing to provide adequate barriers and traffic control).

In the case of *Guerrero v. Deane*, 1:09cv1313 (JCC/TRJ), 2010 WL 670089 (E.D. Va. Feb. 19, 2010), this Court held that the Chief of the Prince William County Police Department "serves in a high position that involves the exercise of judgment and discretion and the execution of important government functions" and is therefore immune from claims of negligence for actions taken in his official capacity which involve the exercise of his judgment and discretion. As Superintendent of the Virginia Department of State Police, Flaherty is in a position analogous to the Chief of the Prince

William County Police Department on a state-wide level.

Flaherty's only role in this case, as alleged in Plaintiff's Complaint, was his failure to implement certain policies and practices within the Department of State Police. The act of designing the training curriculum for the Department of State Police necessarily involves the exercise of judgment and discretion. Applying the *Messina* test, it is clear that sovereign immunity protects Superintendent Flaherty from liability for negligence in designing the training curriculum for the Department of State Police, just as it protected the Prince William County Chief of Police in *Deane*. Thus, the Court dismisses Count II of Plaintiff's Complaint, for wrongful death by negligence, as against Superintendent Flaherty.

### 2. Wrongful Death by Gross Negligence

Count III of Plaintiff's Complaint alleges wrongful death by gross negligence against Superintendent Flaherty and the John Doe Defendants. The sovereign immunity granted to qualifying employees of the Commonwealth under *Messina* is a kind of qualified immunity, and does not extend to intentional torts or torts involving gross negligence. *See Colby v. Boyden*, 241 Va. 125, 400 S.E.2d 184, 187 (1991)(citing *James v. Jane*, 221 Va. 43, 282 S.E.2d 864, 869 (1980); *Sayers v. Bullar*, 180 Va. 222, 22 S.E.2d 9, 12 (1942)). Gross negligence requires a showing that the defendant acted with the "absence of slight

25

diligence, or the want of even scant care." *Frazier v. City of Norfolk*, 234 Va. 388, 362 S.E.2d 688, 691 (1987). "It must be such a degree of negligence as would shock fair minded men although something less than willful recklessness." *Ferguson v. Ferguson*, 212 Va. 86, 181 S.E.2d 648, 653 (1971). "It is a heedless and palpable violation of legal duty respecting the rights of others." *Town of Big Stone Gap v. Johnson*, 184 Va. 375, 35 S.E.2d 71, 73 (1945).

Defendants argue that Plaintiff has failed to identify a specific duty running from Defendants to Plaintiff which they are alleged to have violated. Plaintiff's Complaint lays out several duties allegedly running from Defendant to Plaintiff.[3] The Court notes that courts routinely assess claims for gross

---

[3]   Plaintiff points to the following alleged duties supposedly owed to Mr. Simpson by Defendants:

(1) a duty to protect his life and wellbeing in the performance of their duties; (2) A duty to protect him from reasonable risks of harm; (3) A duty to protect him from the reasonable risks of harm insofar as the risk of foreseeable danger and/or death to him was even greater than others because of his history of mental illness; (4) A duty to act with due care in performing their duties and such actions undertaken by them, and as such, a duty to act with care as to him; and (5) A duty in light of all of the circumstances surrounding him and his mental illness to act reasonably and conform their actions as the circumstances so required in order to deescalate the situation and take him safely into custody for mental evaluation.

(Pl.'s Mem. in Opp'n at 11.)

26

negligence arising from the use of force by police officers
without clearly identifying a specific duty running from the
defendant officers to the plaintiff. *See, e.g.*, *McLenagan v.
Karnes*, 27 F.3d 1002, 1008-09 (4th Cir. 1994)(reversing denial
of summary judgment on gross negligence claims stemming from
police shooting of fleeing detainee); *Milstead v. Kibler*, 91 F.
Supp. 2d 895, 901-902 (W.D. Va. 2000)(granting summary judgment
on gross negligence claims arising from police shooting);
*Russell v. Wright*, 916 F. Supp. 2d 629, 644 (W.D. Va.
2013)(granting summary judgment on gross negligence claims
stemming from use of a taser by police); *Valladares v. Cordero*,
No. 1:06cv1378 (JCC), 2007 WL 2471067, at *5 (E.D. Va. Aug. 27,
2007)(granting summary judgment on gross negligence claim
stemming from use of force in an arrest); *Drake v. Higgins*, No.
Civ.A.97-0143-C, 1999 WL 462987, at *7 (W.D. Va. June 10,
1999)(granting summary judgment on gross negligence claims
stemming from confrontation between police officer and college
student); *Johnson v. City of Richmond, Va.*, No.
Civ.A.3:04CV340, 2005 WL 1668080, at *11-12 (E.D. Va. June 16,
2005)(denying summary judgment on gross negligence claim
stemming from shooting of unarmed detainee).  Accordingly, the
Court presumes the existence of a duty on the part of Defendants
to refrain from engaging in grossly negligent acts and proceeds
to analyze whether the facts alleged could support a finding

that Defendants' actions constituted gross negligence.

Superintendent Flaherty is not alleged to have been present when Decedent was shot, nor is he alleged to have ordered any of the actions resulting in decedent's death. Plaintiff specifically alleges that Superintendent Flaherty was grossly negligent in failing to observe his duty "to act with due care in performing [his] duties by declining to train or inadequately training [his] employees in regard to dealing with mentally ill individuals." (Compl., ¶¶ 50, 55.)  Despite the conclusory language of her Complaint, Plaintiff alleges no facts which could plausibly support an inference that Superintendent Flaherty acted with anything approaching the "absence of slight diligence, or the want of even scant care." *Frazier*, 362 S.E.2d at 691.  In *Deane*, this Court held that a police chief's alleged failure to implement policies and customs regarding training, hiring, and supervision could generally not support a claim for gross negligence.  2010 WL 670089, at *14.  Plaintiff's complaint does not allege any extraordinary failures or oversights by Superintendent Flaherty, and it thus fails to state a claim for wrongful death by gross negligence against Superintendent Flaherty.  Accordingly, the Court dismisses Count III of Plaintiff's Complaint with respect to Defendant Flaherty.

### 3.  Constitutional Claims

Count VI of Plaintiff's Complaint alleges violations

of Decedent's Fourth and Fourteenth Amendment rights by
Superintendent Flaherty and the John Doe Defendants.  Count VI
is brought pursuant to 42 U.S.C. § 1983.  Section 1983 provides
a federal cause of action against "[e]very person" who deprives
another of their constitutional rights under color of state law
within the jurisdiction of the United States.  42 U.S.C. § 1983.
While Superintendent Flaherty is a literal person, a suit
against him in his official capacity is not truly a suit against
him, but a suit against the office of the Superintendent of the
Virginia Department of State Police.  *Brandon v. Holt*, 469 U.S.
464, 471 (1985).  "As such, it is no different from a suit
against the State itself." *Will v. Michigan*, 491 U.S. 58, 71
(1989).  The Supreme Court has held that "neither a State nor
its officials acting in their official capacities are 'persons'
under § 1983." *Id.*  Plaintiff brings this suit against
Superintendent Flaherty in his official capacity, and her
Complaint alleges only actions taken in his official capacity.
Accordingly, the Court dismisses Count VI of Plaintiff's
Complaint as against Superintendent Flaherty.

### C.  John Doe Defendants

Plaintiff brings Counts II, III, and VI against the
John Doe Defendants.  All of the Doe Defendants are officers of
the Virginia Department of State Police, and they are not

individually distinguished in Plaintiff's Complaint.[4]

### 1. Wrongful Death by Negligence

Count II of Plaintiff's Complaint alleges that the Doe Defendants caused Decedent's death through their negligent acts, specifically their "unreasonable and excessive force, and by their refusal to use training techniques regarding mentally ill persons." (Compl. ¶ 44.) In applying the *Messina* test to law enforcement officers, this Court has previously held that "[u]nder Virginia law, ordinary negligence claims cannot lie against a law enforcement officer who was engaged in 'an essential governmental function involving the exercise of discretion and judgment' at the time of the act alleged to be negligent." *Savage v. Cty. of Stafford, Va.*, 754 F. Supp. 2d 809, 817 (E.D. Va. 2010)(citing *Glasco v. Ballard*, 249 Va. 61, 452 S.E.2d 854, 856 (1995)). The Doe Defendants, as Officers of the Virginia Department of State Police, are alleged to have taken actions in furtherance of executing first the ECO, and then the arrest warrant issued for Decedent and the search warrant issued for Decedent's Apartment. The execution of ECOs,

---

[4]   Plaintiff's Complaint is styled as being against "John Does, Police Officers of the Virginia State Department (sic) of Police, the identity and number of whom are presently unknown." Defendants have not raised any objection to this misnomer, and it is clear from the remainder of Plaintiff's Complaint that she means to name unknown Officers of the Virginia Department of State Police as the John Doe Defendants. The Court's analysis in this opinion proceeds on that assumption.

arrest warrants, and search warrants are essential functions of police officers anywhere.  Thus, the Doe Defendants, like Superintendent Flaherty, are entitled to immunity against Plaintiff's claim for wrongful death by negligence, and the Court accordingly dismisses Count II of Plaintiff's Complaint as against the Doe Defendants.

### 2.  Wrongful Death by Gross Negligence

As discussed above, Count III of Plaintiff's Complaint alleges wrongful death by gross negligence against the Doe Defendants, and although the Doe Defendants qualify for sovereign immunity under the *Messina* test, it does not protect them against claims for gross negligence.  *See Colby* 400 S.E.2d at 187 (citations omitted).  Again, gross negligence requires a showing that the defendant acted with the "absence of slight diligence, or the want of even scant care." *Frazier* 362 S.E.2d at 691.

No reasonable jury could possibly find that the conduct alleged in Plaintiff's complaint rises to this level. The Doe Defendants, as officers of the VSP, are not alleged to have taken any actions or have been involved with Decedent in any way until at or around 5:30 p.m. of October 6, 2014. (Compl., ¶ 19.)  At that point the Doe Defendants were presented with the apparently mentally ill Decedent, barricaded in his house, having recently provided officers of the FCPD with a

31

receipt for a shotgun. (*Id.* at ¶¶ 17, 19.)  The facts alleged demonstrate that after the Doe Defendants arrived, police attempted to bring about a peaceful resolution through negotiations and then attempted to incapacitate Decedent using the less-lethal force of a stun gun before ultimately proceeding to use tear gas and finally lethal force. (*Id.* at ¶¶ 20-28.) The specific actions the Doe Defendants, rather than officers with another police department, are alleged to have taken are: (1) the deployment of one or more heavily armed tactical operations teams with two armored personal carriers at or around 12:00 a.m. on October 7, 2014; (2) the use of flashbangs to distract Decedent as the Doe Defendants breached the window of Decedent's house with a "throw phone" at or around 12:00 a.m. on October 7, 2014 (3) the firing of tear gas canisters into Decedent's home through the windows beginning at or around 1:00 a.m. on October 7, 2014 and continuing intermittently until at or around 6:45 a.m. of the same day; (4) the shooting of Decedent by several Doe Defendant snipers as he emerged from the front door firing his shotgun at or around 6:45 a.m. on October 7, 2014; (5) firing at Decedent's shotgun to render it inoperable as he lay on his back in the doorway with his gun between his legs, the barrel resting on the floor and the butt positioned near his chest, after Decedent had been shot; and (6) shooting Decedent in the chest with a beanbag round to see if he

was incapacitated or still an active threat as he lay on the ground after being shot. Even viewing the facts in the light most favorable to the Plaintiff, these actions clearly indicate a cautious, slow escalation in force in response to the increasing threat posed by Decedent at the various stages of the standoff. At no point do they indicate anything approaching "a heedless and palpable violation of legal duty respecting the rights of others." *Town of Big Stone Gap*, 35 S.E.2d at 73.

Plaintiff urges the Court to find that Defendants were grossly negligent in not simply standing pat and waiting for Mr. Simpson to turn himself in once God signaled to him that this was the right course of action by failing to levitate a model of a local restaurant from his sidewalk into his house at 9 a.m. the next morning. Even viewing the facts in the light most favorable to the Plaintiff, Defendants' decision not to patiently wait for an armed, delusional, likely violent man to turn himself in once God instructed him to do so cannot be considered "the absence of slight diligence, or the want of even scant care." *Frazier*, at 691. If Defendants had let the mentally ill Decedent walk out with his shotgun and the model of the restaurant and he had shot or otherwise injured a passerby, the Court "do[es] not doubt that [it] would today be deciding whether [Defendants'] decision in *that* case constituted 'complete neglect of the safety of another.'" *McLenagan*, 27

33

F.3d at 1009 (4th Cir. 1994)(ordering dismissal of a gross negligence claim for shooting an unarmed prisoner attempting to flee and believed to be in possession of a firearm.) Accordingly, because the facts alleged could not support a finding that the Doe Defendants acted with gross negligence in the standoff that ultimately resulted in Decedent's death, the Court dismisses Count III of Plaintiff's Complaint as against the Doe Defendants without prejudice.

### 3. Constitutional Claims

Finally, Plaintiff alleges that the Doe Defendants subjected Decedent to unreasonable and excessive force and deprived him of his life and liberty without due process of law in violation of the Fourth and Fourteenth Amendments. (Compl. ¶ 68.)  As a preliminary matter, Plaintiff plainly fails to state a claim for excessive use of force in violation of the Fourteenth Amendment.  The Fourteenth Amendment's Due Process Clause applies only to excessive force claims brought by individuals already in custody. *See Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).  Plaintiff does not allege that Mr. Simpson was in custody when any of the allegedly excessive uses of force took place.

Claims of excessive force in the course of an arrest or other seizure are analyzed under the Fourth Amendment's

34

reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395
(1989). To prove excessive force, the plaintiff must show "that
the officer's use of force to achieve arrest was objectively
unreasonable under the circumstances." *Miller v. Parrish*, No.
3:12cv873, 2013 WL 1868028, at *7 (E.D. Va. May 2, 2013) (citing
*Graham*, 490 U.S. at 395). "The 'reasonableness' of a particular
use of force must be judged from the perspective of a reasonable
officer on the scene, rather than with the 20/20 vision of
hindsight." *Graham*, 490 U.S. at 396. In particular, courts
should consider "the severity of the crime at issue, whether the
suspect poses an immediate threat to the safety of the officers
or others, and whether he is actively resisting arrest or
attempting to evade arrest by flight." *Meyers v. Balt. Cty.,
Md.*, 713 F.3d 723, 732-33 (4th Cir. 2013) (quoting *Graham*, 490
U.S. at 396)). Additionally, "the extent of the plaintiff's
injury is also a relevant consideration." *Jones*, 325 F.3d at
527. Courts must consider "the salient events 'in full context,
with an eye toward the proportionality of the force in light of
all the circumstances.'" *Parker v. Loren*, No. 1:13cv927, 2015
WL 3767555, at *4 (E.D. Va. June 16, 2015) (quoting *Rowland v.
Perry*, 41 F.3d 167, 173 (4th Cir. 1994)).

Even where an official sued under § 1983 has violated
the aggrieved party's Fourth Amendment rights, the official "is
entitled to qualified immunity unless it is shown that the

official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)(quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)).  A defendant will only be held to have violated a clearly established right where "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.*  This requires that "the existing precedent must have placed the statutory or constitutional question' confronted by the official beyond debate." *Id.* (internal quotations omitted).  The Supreme Court has repeatedly warned courts "not to define clearly established law at a high level of generality." *Ashcroft*, 131 S. Ct. at 2074.  The right must be defined with a fine grain, as an overly broad definition "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, 134 S. Ct. at 2023.

In her complaint and memorandum in opposition, Plaintiff argues that Defendants set in motion the chain of events leading to the eventual shooting of Mr. Simpson by unreasonably deploying "military-style machinery and dozens of police officers" in an escalation of the standoff. (Pl.'s Mem. in Opp'n at 20.)  However, the Fourth Circuit recently held that a "police officer's pre-seizure conduct, regardless of whether

it was ill-advised or violative of law enforcement protocol, is generally not relevant for purposes of an excessive force claim under the Fourth Amendment which looks only to the moment force is used." *Gandy v. Robey*, 520 F. App'x 134, 142 (4th Cir. 2013).[5]  The Fourth Circuit referred to a theory of "setting-in-motion" a constitutional violation as "highly dubious in the excessive force context," and found "the mere decision itself to make a surprise entry as opposed to other alternatives affords no basis for liability." *Id*.  Plaintiff has cited no cases to refute this precedent.  Accordingly, Defendants' decision to deploy military style equipment and police snipers, although possibly ill-advised, is not relevant to Plaintiff's claim of unreasonable force.

Plaintiff points to three allegedly excessive actual uses of force; first, the use of flashbangs and teargas canisters against Decedent after negotiations had broken down but before Decedent began firing his shotgun out of his window; second, the shooting of Decedent by police snipers when he exited the house firing his shotgun; and third, the use of a K9

---

[5]     This unpublished opinion is not binding precedent in the Fourth Circuit, but still indicates the unlikely existence of the right Plaintiff asserts here. *See Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379, 401 n.10 (4th Cir. 2014) (noting that unpublished opinions do not "reflect the kind of judicial disagreement that makes qualified immunity appropriate," but also that they "may reflect judicial disagreement about whether a right is in fact clearly established").

unit dog to attempt safe physical apprehension after Decedent
had already been shot.  (Compl. ¶¶ 24-31; Pl.'s Mem. in Opp'n at
21-22.)

   It was the FCPD, rather than the Doe Defendants, who
"brought in" the K9 unit to attempt physical apprehension under
the facts as alleged in Plaintiff's complaint.  (Compl., ¶ 31.)
Because the Doe Defendants are not alleged to have taken any
part in the use of the K9 unit, and neither the FCPD nor any of
its officers are named as defendants in Plaintiff's Complaint,
the use of the K9 unit is irrelevant to Plaintiff's claims in
this case.  The Court will now address the other two uses of
force identified by Plaintiff.

   The first allegedly excessive use of force occurred
when police used teargas and flashbangs against Decedent in his
house after communications had broken down.  As alleged in
Plaintiff's complaint, the police did not resort to teargas and
flashbangs until Decedent had ceased productively communicating
with police and had passed them a receipt for a shotgun he had
illegally purchased.  (Compl. ¶¶ 17, 23-24.)  It was not
unreasonable for the officers on the scene to interpret
Decedent's delivery of the receipt for the shotgun as a
declaration that he was armed with a shotgun in his house.  At
that point in time, officers were confronted with an armed,
mentally unstable individual, who was resisting an ECO, a search

warrant, and an arrest warrant, and who had terminated communications with police. No reasonable jury could find that the use of non-lethal measures like flashbangs and teargas to attempt to force the very likely armed, certainly unstable, and undeniably uncooperative Mr. Simpson out of his house, where he posed a serious threat to himself and any officer attempting to apprehend him, and into the open, where he could be more safely apprehended, was an unreasonable use of force. Accordingly, the use of flashbangs and tear gas was not an excessive use of force and did not violate Mr. Simpson's Fourth Amendment rights.

Ultimately, the standoff proceeded for several hours during which Mr. Simpson fired his shotgun out of his window several times, and ended with Mr. Simpson exiting the house firing his shotgun and being shot several successive times by police snipers. Plaintiff does not allege that any of the shots which hit Decedent took place after Decedent had been incapacitated. (Compl. ¶¶ 27-29.) When the John Doe Defendants shot Decedent, he was exiting his house after hours of sporadic gunfire at police outside his house, and was firing his shotgun. There is no doubt that at that moment they shot Decedent, the Doe Defendants were reasonably concerned that Decedent posed an imminent threat of severe bodily harm to them, their fellow officers, and the public at large. *See Estate of Williams v. Clemens*, No. 96-2425, 1997 WL 697197 (4th Cir. Nov. 7,

1997)(finding the fatal shooting of an armed, mentally ill individual after a protracted standoff involving sporadic gunfire to be reasonable).

Plaintiff argues that these actions were "especially extreme when considering the knowledge officers had of [Decedent's] illness and his previous reactions to their tactics." (Pl.'s Mem. in Opp'n at 22.)  However, the Fourth Circuit has previously held that "[k]nowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public when faced with threatening conduct by the disabled individual." *Bates v. Chesterfield Cty.*, 216 F.3d 367, 372 (4th Cir. 2000). Decedent's mental illness did not require Defendants to leave Decedent, a mentally ill, armed individual, to his own devices for several hours as he willfully violated court orders and resisted entering custody.  Defendants were rightly hesitant to trust the judgment of a man who wanted to see if God would levitate his model of a local restaurant back into his house from the sidewalk in a sign of his righteous claim to ownership. Because the facts alleged cannot sustain a claim that Plaintiff's Fourth Amendment rights were violated by the unreasonable application of excessive force, the Court dismisses Plaintiff's § 1983 claims against the Doe Defendants.

Even if the Doe Defendants' alleged actions were
unreasonable in light of the circumstances, they certainly did
not violate any clearly established law.  Plaintiff does not
point to, and this Court cannot find, any case law clearly
establishing that any of the Doe Defendants' actions were
unreasonable in light of the situation.  As discussed above, the
weight of Fourth Circuit and Supreme Court case law addressing
situations similar to the one presented by this case strongly
suggests that the Doe Defendant's actions were reasonable.  *See
Estate of Williams*, 1997 WL 697197 at *2; *Bates*, 216 F.3d at
372; *Gandy*, 520 F. App'x at 142.  The cases dealing with
standoffs between police officers and armed, mentally ill
individuals "by no means clearly establish that [the Doe
Defendants] conduct violated the Fourth Amendment." *Brosseau v.
Haugen*, 543 U.S. 194, 201 (2004)(per curiam).  There is
therefore no way a reasonable jury could possibly find that the
Doe Defendants' conduct as alleged violated a "clearly
established" right.

Because none of Plaintiff's claims remain after
dismissal of Plaintiff Constitutional Claims against the Doe
Defendants, Plaintiff's Complaint is dismissed in its entirety.

## IV. Conclusion

For the foregoing reasons, the Court grants
Defendant's Motion to Dismiss.  Plaintiff's complaint is

dismissed in its entirety.  Counts I and II, as interpreted above, are dismissed with prejudice as to all Defendants.  Count III, as interpreted above, is dismissed with prejudice as to the Commonwealth and Superintendent Flaherty.  Count III is dismissed without prejudice as to the Doe Defendants.  Count IV is dismissed with prejudice as to all Defendants.  Count V is dismissed with prejudice as to all Defendants.  Count VI is dismissed with prejudice as to the Commonwealth and Superintendent Flaherty.  Count VI is dismissed without prejudice as to the Doe Defendants.

An appropriate Order shall issue.


/s/
_____
July 21, 2016                    James C. Cacheris
Alexandria, Virginia       UNITED STATES DISTRICT COURT JUDGE